IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MARV W. HUBBARD,** | ) | |
|     Plaintiff | ) | Civil Action No. 2:22cv00019 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | By:  PAMELA MEADE SARGENT |
| **Acting Commissioner of Social** | ) |     United States Magistrate Judge |
| **Security,** | ) | |
|     Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Marv W. Hubbard, ("Hubbard"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Hubbard protectively filed applications for DIB and SSI[1] on September 24, 2020, alleging disability as of October 2, 2019,[2] due to bulging discs in his back; a fracture at the L4; anxiety; and depression. (Record, ("R."), at 12, 227-33, 246, 281.) The claims were denied initially and on reconsideration. (R. at 150-77.) Hubbard requested a hearing before an administrative law judge, ("ALJ").

---

[1] Hubbard previously filed applications for DIB and SSI on June 16, 2017, alleging disability as of April 1, 2015. (R. at 714.) By decision dated October 2, 2019, the ALJ denied his claims. (R. at 71-93.) Thereafter, Hubbard filed an appeal in this court, and by order entered November 18, 2021, the court affirmed the Commissioner's decision denying benefits. (R. at 143.) *See Hubbard v. Kijakazi*, 2021 WL 5103892 (W.D. Va. Nov. 3, 2021).

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See* 56 Fed. Reg. 36932-01, at *36960, 1991 WL 142361 (Aug. 1, 1991). Those standards have been superseded by 20 C.F.R. §§ 404.1520c, 416.920c, which prescribe how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright*. *See* Program Operations Manual System, ("POMS"), DI 24503.005, available at https://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence).

The ALJ in this case noted he reviewed the previous October 2019 decision and gave it some weight, as the record continued to support a light residual functional capacity finding. (R. at 23.) The ALJ noted that Hubbard continued to have only conservative care and typically had normal physical examinations. (R. at 23.) However, the ALJ noted that Hubbard began to complain of shoulder pain and was diagnosed with osteoporosis on a bone density scan. (R. at 23.) He found the residual modifications as set out in his residual functional capacity findings accommodated these findings. (R. at 23.)

[2] Hubbard initially alleged an onset date of disability of April 1, 2015. (R. at 227.) However, he amended his alleged onset date to October 2, 2019. (R. at 12.)

(R. at 178.) A hearing was held on January 25, 2022, at which Hubbard was represented by counsel. (R. at 32-67.)

By decision dated February 2, 2022, the ALJ denied Hubbard's claims. (R. at 12-26.) The ALJ found Hubbard met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2020. (R. at 14.) The ALJ found Hubbard had not engaged in substantial gainful activity since October 2, 2019, the alleged onset date. (R. at 14.) The ALJ determined Hubbard had severe impairments, namely, lumbar spine degenerative disc disease; status-post compression fracture at the L4 level; depression; anxiety; borderline intellectual functioning; and osteoporosis, but he found Hubbard did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-15.)

The ALJ found Hubbard had the residual functional capacity to perform light[3] work, except he could occasionally operate hand controls with the right hand; he could occasionally reach overhead to the right, and frequently reach to the right for all other reaching; he could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; he could never climb ladders, ropes or scaffolds or work around unprotected heights or hazardous machinery; he could occasionally work on vibrating surfaces; he could understand, remember and perform simple, routine, repetitive tasks with simple, short instructions and make simple work-related decisions; he could concentrate, persist and maintain pace for two-hour segments

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2022).

with normal breaks as allowed by the employer to complete an eight-hour workday and 40-hour workweek; he could occasionally interact with the public, co-workers and supervisors; he could respond appropriately to supervision and work situations; and any time off task would be accommodated by normal breaks. (R. at 18-19.) The ALJ found Hubbard was unable to perform his past relevant work as line installer/repairer. (R. at 24.) Based on Hubbard's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Hubbard could perform, including the jobs of a price marker, a routing clerk and an office cleaner. (R. at 25-26, 59-60.) Thus, the ALJ concluded Hubbard was not under a disability as defined by the Act, and he was not eligible for SSI and DIB benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2022).

After the ALJ issued his decision, Hubbard pursued his administrative appeals, (R. at 223-24), but the Appeals Council denied his request for review. (R. at 1-5.) Hubbard then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2022). This case is before this court on Hubbard's motion for summary judgment filed February 14, 2023, and the Commissioner's motion for summary judgment filed March 16, 2023.

## II. Facts

Hubbard was born in 1971, (R. at 25, 227), which, at the time of the ALJ's decision, classified him as a "person closely approaching advanced age," and on the alleged onset date of disability, classified him as a "younger person." *See* 20

C.F.R. §§ 404.1563(c), (d), 416.963(c), (d) (2022). He has a tenth-grade education[4] and past work experience as a line installer and repairer and a lead worker. (R. at 40, 58, 247.) Hubbard testified at his hearing that he sustained a work-related injury to his back in 2013[5] and again in 2015.[6] (R. at 44.) He stated due to low back and right hip and leg pain, he could stand and sit for up to 10 minutes each without interruption. (R. at 45-46.) He stated he spent up to six hours in an eight-hour period reclining or lying down because of pain. (R. at 46.) Hubbard stated he experienced right shoulder pain that caused his right hand and fingertips to go numb and made it difficult to obtain a good grip on objects. (R. at 47-48.) He stated he had difficulty reaching overhead with his right arm due to pain and numbness, as well as difficulty extending his arm at shoulder and chest level. (R. at 49-50.)

In rendering his decision, the ALJ reviewed records from Joseph Leizer, Ph.D., a state agency psychologist; Dr. Robert McGuffin, Jr., M.D., a state agency physician; Richard Milan, Jr., Ph.D., a state agency psychologist; Dr. Jack Hutcheson, M.D., a state agency physician; Wellmont Medical Associates; Arthur

---

[4] It was noted at Hubbard's hearing that he had not received his General Educational Development, ("GED"), diploma. (R. at 40, 42.) Under the regulations, therefore, Hubbard has a "limited education," which is defined as "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education." 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3) (2022).

[5] Hubbard injured his low back in March 2013. (R. at 443.) An MRI of Hubbard's lumbar spine showed a compression fracture at the L4 level. (R. at 443.) The record also shows Hubbard was treated for back pain in May 2012. (R. at 445.)

[6] In June 2015, x-rays of Hubbard's lumbar spine showed a healed 25 percent compression fracture at the L4 level and mild disc space narrowing at the L3-L4 level. (R. at 444.)

W. Stair, III, M.A., a licensed senior psychological examiner; and Simpson Clinic, L.L.C., ("Simpson Clinic").

From January 2019 through May 2019, Hubbard received pain management at the Simpson Clinic for his complaints of chronic low back pain and bilateral leg pain. (R. at 510, 520, 578.) Hubbard routinely reported he had good pain relief with his current pain medication, which enabled him to perform his activities of daily living. (R. at 562, 570, 578.) He reported that he was walking and swimming for exercise. (R. at 575, 578.) Examination findings showed that Hubbard was alert and fully oriented; his affect was appropriate; he had no peripheral edema; he ambulated and sat easily; he had intact sensation; and he had tenderness on palpation of the lumbar spine. (R. at 562, 570.) On April 17, 2019, Hubbard saw Laura Templeton, F.N.P., a family nurse practitioner, with the Simpson Clinic, reporting chronic back pain. (R. at 510.) He stated the pain interfered with his ability to perform his activities of daily living. (R. at 510.) Hubbard reported his sleep had improved with medication. (R. at 510.) Hubbard was alert and fully oriented; his affect was appropriate; he had no edema in his bilateral lower extremities; his pedal pulses were palpable, bilaterally; he ambulated and sat easily; he had intact sensation; and he had tenderness on palpation of the cervical spine and left shoulder. (R. at 510.) That same day, Templeton noted that Hubbard was "unable to work permanently." (R. at 488.) She noted that Dr. Shaun Hines, D.O.,[7] evaluated Hubbard and opined that he was completely disabled due to complaints of back pain, and he was unable to walk and stand for a full workday.

---

[7] On November 4, 2017, Dr. Hines examined Hubbard at the request of Disability Determination Services. (R. at 460-62.) This court's previous Report and Recommendation addressed Dr. Hines's report. Therefore, this evidence will not be discussed here. *See Hubbard*, Case No. 2:20cv00025, (Docket Item No. 18).

(R. at 488.) On May 20, 2019, Hubbard saw Tina Graham, F.N.P., a family nurse practitioner, reporting good pain relief with current medication regimen, which enabled him to perform his activities of daily living more easily. (R. at 501.) He reported he was walking several times a week for exercise. (R. at 501.) Hubbard was alert and fully oriented; his affect was appropriate; he had no edema in his bilateral lower extremities; his pedal pulses were palpable, bilaterally; he ambulated and sat easily; and he had tenderness on palpation of the cervical spine and left shoulder. (R. at 501.) Graham diagnosed chronic low back pain and degenerative disc disease with radiculopathy, stable, as Hubbard had adequate pain relief. (R. at 502.) Hubbard was diagnosed with chronic low back pain; L4 compression fracture; lumbar degenerative disc disease; L4-L5 herniated nucleus pulposus; facet arthropathy throughout the lumbar spine; lumbar spine radiation, bilaterally; osteoarthritis of the right knee, which was adequately controlled and stable; muscle spasms; and a sleep disorder. (R. at 563, 571, 579.)

On May 28, 2019, Arthur W. Stair, III, M.A., a licensed senior psychological examiner, evaluated Hubbard at the request of his attorney.[8] (R. at 466-69.) Hubbard had good hygiene and grooming; his balance, gait and posture were compromised, as he walked rather slowly in a slightly hunched over position.[9] (R. at 466.) Hubbard stated he avoided being around people, including family members. (R. at 467.) Stair diagnosed major depressive disorder, moderate

---

[8] There are multiple pages of Stair's report missing from the record. (R. at 466-69.)

[9] Stair also noted that Hubbard had to stand several times during the evaluation to stretch his back and legs and, after the evaluation, it took him several seconds to be able to stand from the chair. (R. at 466.) In addition, Stair observed Hubbard walking very slowly across the parking lot to his car. (R. at 466.)

to severe; generalized anxiety disorder, moderate, with mild panic features; and borderline intellectual functioning.[10] (R. at 469.)

On July 30, 2019, Stair completed a mental assessment,[11] indicating Hubbard had a satisfactory ability to follow work rules. (R. at 470-71.) Stair found Hubbard had serious limitations, resulting in unsatisfactory work performance, in his ability to relate to co-workers; to deal with the public; to use judgment in public; to function independently; and to maintain attention and concentration. (R. at 470.) Stair found Hubbard had no useful ability to interact with supervisors and to deal with work stresses. (R. at 470.) He opined that Hubbard would be absent from work more than two days a month. (R. at 471.) Stair based these findings on Hubbard's major depressive disorder and generalized anxiety disorder. (R. at 470-71.)

From February 2021 through January 2022, Hubbard saw Dr. Michael W. Wheatley, M.D., a physician with Wellmont Medical Associates, reporting anxiety; depression; chronic back pain; leg pain and numbness; cervical pain; and gluteal pain. (R. at 327, 373, 377, 415, 419, 424, 593, 602-03, 607-08, 612, 636.) Hubbard had normal range of motion with no tenderness; he was fully oriented; and his mood, affect and behavior were normal. (R. at 329, 375, 379, 418, 421, 426, 596, 601, 605-06, 610, 615, 629, 639.) Hubbard regularly reported medications and home exercises provided moderate pain relief and that medications controlled his hypertension and depression. (R. at 327, 373, 419, 424,

---

[10] Stair noted Hubbard's full-scale IQ score was 80, which was consistent with the fact that he struggled in school, as he failed most of his subjects in the middle school years, and his standardized achievement scores from school indicated far below average performance and ability. (R. at 468.)

[11] There is a page missing from this assessment.

593, 598, 608, 611-12.) Hubbard denied anxiety, and Dr. Wheatley reported that Hubbard was not nervous or anxious. (R. at 327, 329, 37, 421, 595, 604, 609, 614, 628, 638.) Hubbard was diagnosed with lumbar degenerative disc disease; generalized anxiety disorder; insomnia due to other mental disorder; and hypertension. (R. at 379.)

On February 27, 2021, x-rays of Hubbard's lumbar spine showed multiple compression deformities of the vertebral bodies; degenerative facet arthropathy at the L4-L5 and L5-S1 levels; and a small lucency at the L3 vertebral body, possibly a small benign bone cyst. (R. at 394-95.)

On April 5, 2021, an MRI of Hubbard's lumbar spine showed a subacute T12 compression fracture with 50 percent height loss; an old L4 compression fracture with 25 to 30 percent height loss; and mild multi-level disc and facet joint degenerative changes leading to varying degrees of lateral recess and neural foraminal stenosis. (R. at 330, 389-92.) A bone density scan showed osteoporosis. (R. at 392.) A compression fracture of the T12 vertebra was added to Hubbard's diagnosis. (R. at 330.) Dr. Wheatley ordered a lumbar back brace with supporting pad. (R. at 588.)

On April 9, 2021, Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Hubbard had mild limitations on his ability to understand, remember or apply information and to adapt and manage himself; and moderate limitations on his ability to interact with others and to concentrate, persist or maintain pace. (R. at 105-06.) Leizer noted Hubbard did not have mental health treatment, and his primary care physician recently prescribed Cymbalta. (R. at 106.) In addition, he noted that Hubbard's

examinations showed he was alert and fully oriented; he had a normal mood, affect and behavior; he was not anxious or nervous; and he had no confusion. (R. at 106.)

That same day, Leizer completed a mental assessment, finding Hubbard had moderate[12] limitations in his ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public. (R. at 108-09.) Leizer stated Hubbard's work-related mental abilities were, otherwise, not significantly limited. (R. at 108-09.) Leizer based his findings on Hubbard's nervousness/anxiousness, that he did not like to be around people and that he might have problems sustaining concentration and persistence; therefore, he limited Hubbard to occasional direct interaction with the public, but found he was capable of simple, routine work. (R. at 109.)

On April 11, 2021, Dr. Robert McGuffin, Jr., M.D., a state agency physician, completed a medical assessment, finding Hubbard could occasionally lift and carry items weighing 20 pounds and 10 pounds frequently; stand and/or walk and sit a total of six hours each in an eight-hour workday; and push and pull as much as the lift/carry restrictions. (R. at 108.) Dr. McGuffin indicated no postural, manipulative, visual, communicative or environmental limitations. (R. at 108.)

---

[12] The regulations define "moderate limitations" as an individual's ability to function independently, appropriately, effectively and on a sustained basis as fair. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2022).

On May 20, 2021, x-rays of Hubbard's thoracic spine showed a compression fracture at the T12 vertebra. (R. at 429.) On September 7, 2021, although Hubbard reported he had moderate limitations with his physical activity, it was noted that he exhibited improvements in activity with medication and psycho-social improvement. (R. at 598.) Hubbard reported he had a "pop in his back" after he bent over, which caused a burning sensation in his back. (R. at 598.) Dr. Wheatley ordered an x-ray of Hubbard's lumbar spine. (R. at 602.)

On July 16, 2021, Richard Milan, Jr., Ph.D., a state agency psychologist, completed a PRTF, finding Hubbard had mild limitations on his ability to understand, remember or apply information and to adapt or manage himself; and moderate limitations on his ability to interact with others and to concentrate, persist or maintain pace. (R. at 127-28.) Milan noted Hubbard continued to follow up with his primary care physician for his psychiatric conditions. (R. at 128.) He noted that Hubbard's examinations showed he was alert and fully oriented, and he had a normal mood, affect and behavior. (R. at 128.) In addition, Milan noted that Hubbard was able to prepare simple meals, shop, handle his finances and perform his personal care. (R. at 128.) Milan opined Hubbard could perform simple work. (R. at 128.)

On July 16, 2021, Dr. Jack Hutcheson, Jr., M.D., a state agency physician, completed a medical assessment, finding Hubbard could occasionally lift and carry items weighing 20 pounds and 10 pounds frequently; stand and/or walk and sit a total of six hours each in an eight-hour workday; and push and pull as much as the lift/carry restrictions. (R. at 130-32.) He found Hubbard had an unlimited ability to balance, kneel and crawl; he could occasionally climb ramps and stairs, stoop and crouch, but never climb ladders, ropes or scaffolds; he should avoid concentrated

exposure to vibration; and he should avoid even moderate exposure to hazards. (R. at 131.) Dr. McGuffin indicated no manipulative, visual or communicative limitations. (R. at 131.) He based his findings on Hubbard's back pain and history of hypertension. (R. at 130-31.)

On December 2, 2021, Hubbard saw Dr. Wheatly, reporting cervical pain and moderate limitations with his physical activity; however, it was noted that Hubbard exhibited improvements in activity with medication, as well as psycho-social improvement. (R. at 612.) Dr. Wheatley ordered x-rays of Hubbard's cervical spine. (R. at 616.) On December 8, 2021, x-rays of Hubbard's cervical spine showed mild multi-level degenerative disease. (R. at 620.) On December 30, 2021, Hubbard saw Dr. Wheatley, reporting no complaints. (R. at 626.)

On January 20, 2022, Hubbard saw Dr. Wheatley for disability evaluation. (R. at 636.) Hubbard reported cervical pain that was diminished with medication. (R. at 636.) Dr. Wheatley opined that Hubbard could not lift, push or pull items weighing more than 20 pounds. (R. at 640.) That same day, Dr. Wheatley completed a medical assessment, finding Hubbard could occasionally lift items weighing up to 25 pounds and less than five pounds frequently; stand and/or walk a total of 90 minutes in an eight-hour workday and up to 20 minutes without interruption; sit a total of two hours in an eight-hour workday and up to 30 minutes without interruption; occasionally climb, stoop, kneel, balance, crouch and crawl; his abilities to reach, to handle, to feel and to push/pull were limited; and he was restricted from working around moving machinery, temperature extremes, noise and vibration. (R. at 623-25.) Dr. Wheatley based his findings on Hubbard's compression fractures, degenerative disc disease and complaints of sensation loss

in the right hand. (R. at 623-24.) He opined Hubbard would be absent from work more than two days a month. (R. at 625.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2022). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2022).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Hubbard filed his applications in September 2020; thus, 20 C.F.R. §§ 404.1520c, 416.920c, govern how the ALJ considered the medical opinions here.[13] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimants' medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920(a) (2022). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2022) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2022).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (2021). "Consistency" denotes "the extent to which the opinion is consistent with

---

[13] 20 C.F.R. §§ 404.1520c, 416.920c apply to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (2022). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[14] *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

    A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2022). The ALJ found Hubbard had the residual functional capacity to perform light work, except he could occasionally operate hand controls with the right hand; he could occasionally reach overhead to the right, and frequently reach to the right for all other reaching; he could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; he could never climb ladders, ropes or scaffolds or work around unprotected heights or hazardous machinery; he could occasionally work on vibrating surfaces; he could understand, remember and perform simple, routine, repetitive tasks with simple, short instructions and make simple work-related decisions; he could concentrate, persist and maintain pace for two-hour segments with normal breaks as allowed by the employer to complete an eight-hour workday and 40-hour workweek; he could occasionally interact with the public, co-workers and supervisors; he could respond appropriately to supervision and work

---

[14] An exception to this is when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (2022).

situations; and any time off task would be accommodated by normal breaks. (R. at 18-19.)

Hubbard argues the ALJ erred by improperly determining his residual functional capacity by rejecting the opinions of Drs. Hines, Baluyot and Wheatley, nurse practitioner Templeton and psychologist Stair.[15] (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Based on my review of the record, I disagree. The ALJ noted that Dr. Baluyot and Templeton completed a Form opining Hubbard was permanently unable to work. (R. at 23, 465, 488.) The ALJ found these opinions did not constitute a medical opinion. (R. at 23-24.)

---

[15] The court notes that these assessments, except Dr. Wheatley's assessment, were offered and considered in the previously adjudicated period and were found to be unpersuasive in the ALJ's October 2019 decision. (R. at 86-87.) In addition, upon appeal, this court found that substantial evidence existed to support the ALJ's consideration of the medical evidence. For instance, the court found that Dr. Hines's exertional restrictions were based upon subjective back pain allegations, and Dr. Hines had no imaging evidence to support his opinion of suspected bulging back disc. *See Hubbard*, 2021 WL 5103892, at *5.

The court addressed the treatment notes and the Patient Injury And Work Status form, ("Form"), completed by Dr. Virginia Baluyot. M.D., and Templeton. The court explained that these opinions were not persuasive, as they did not provide a detailed residual functional capacity or limitations and did not clarify how many hours in an eight-hour workday Hubbard could stand or walk. Instead, they merely adopted the findings of Dr. Hines that he could not walk and stand for a full workday. *See Hubbard*, 2021 WL 5103892, at *12.

The court addressed Stair's May and July 2019 opinions and explained that Stair examined Hubbard on one occasion and mainly relied on Hubbard's self-report of mental symptoms in arriving at his opinion. *See Hubbard*, 2021 WL 5103892, at *14. Again, in this case, the ALJ found these opinions unpersuasive, as they were not supported by Stair's own examination findings and were inconsistent with the record, which shows Hubbard typically had normal mental status examinations without required hospitalizations or regular complaints of symptoms. (R. at 24.)

In addition, the court noted that Hubbard generally was treated with oxycodone, which he repeatedly reported controlled his pain, and which treating providers deemed stable. With respect to his mental impairments, the court noted that treatment notes reflected normal mental status examinations, and he had never sought emergency psychiatric treatment or been psychiatrically hospitalized. *See Hubbard*, 2021 WL 5103892, at *14, *15.

Because this claim was filed after March 27, 2017, the criteria set forth in 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2), governs whether a statement qualifies as a medical opinion. The term "medical opinion," as used in §§ 404.1520c, 416.920c, is specifically defined in §§ 404.1513(a)(2), 416.913(a)(2), which define "medical opinion" as:

> (a)(2) …A medical opinion is a statement from a medical source about what you can do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:…
> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
> (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
> (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2022). Under the applicable rules for evaluating medical opinions, the ALJ is not to defer to or give any specific weight to medical opinions. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Contrary to Hubbard's argument, the record contains no statement from Dr. Baluyot or Templeton that meets the regulatory definition of a medical opinion in 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2), as they never addressed any particular abilities or restrictions that were imposed by Hubbard's impairments. Templeton's treatment notes, as well as the treatment notes from other health care providers at

the Simpson Clinic, consistently show that Hubbard was alert and fully oriented; his affect was appropriate; he had no peripheral edema; he ambulated and sat easily; he had intact sensation; and he had tenderness on palpation of the lumbar spine. Hubbard routinely reported that he had good pain relief with his current pain medication, which enabled him to perform his activities of daily living. Hubbard also reported that he was walking and swimming for exercise. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Based on my review of the record, I do not find that Dr. Baluyot and Templeton's opinions that Hubbard was permanently unable to work meet the regulatory definition of a "medical opinion" under 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). While Templeton's notes provide Hubbard's medical history, clinical findings, diagnoses and treatment prescribed, she did not mention whether or how this would impact or limit his ability to work. That is, no mention is made of Hubbard's ability to perform any physical demands of work, mental demands of work, other demands of work or ability to adapt to environmental conditions. *See* 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

The ALJ noted he found the opinions of the state agency psychologists somewhat persuasive, as they cited to specific evidence in support of their opinions. (R. at 23.) The state agency psychologists found Hubbard had mild limitations in his ability to understand, remember or apply information and to adapt or manage himself and moderate limitations in his ability to interact with others and to concentrate, persist or maintain pace. However, the ALJ noted their opinions were only somewhat consistent with the record, which also supports a moderate limitation in his ability to understand, remember or apply information,

based on Hubbard's IQ testing, hearing testimony and diagnoses of anxiety and depression with the complaints of poor focus. (R. at 23.) Thus, the ALJ found Hubbard could understand, remember and perform simple, routine, repetitive tasks with simple, short instructions and make simple work-related decisions; he could concentrate, persist and maintain pace for two-hour segments with normal breaks; he could occasionally interact with the public, co-workers and supervisors; he could respond appropriately to supervision and work situations; and any time off tasks would be accommodated by normal breaks. (R. at 18-19.)

The ALJ noted that he also found the opinions of the state agency physicians somewhat persuasive. (R. at 23.) The ALJ noted Hubbard complained of pain at the hearing, but typically reported symptom improvement with conservative measures, including medications. (R. at 23.) However, based on Hubbard's subjective hearing testimony, as well as multiple physical impairments and their associated symptoms, the ALJ afforded him additional limitations, including limiting him to occasionally operating hand controls with the right hand; occasionally reaching overhead to the right; and frequently reaching to the right for all other reaching. (R. at 18-19, 23.)

The ALJ found Dr. Wheatley's January 2022 opinion somewhat persuasive, as it is supported by his treatment notes. (R. at 24.) Dr. Wheatley opined that Hubbard could not lift, push or pull items weighing more than 20 pounds. (R. at 640.) That same day, Dr. Wheatley completed a medical assessment, finding Hubbard could occasionally lift items weighing up to 25 pounds and less than five pounds frequently; stand and/or walk a total of 90 minutes in an eight-hour workday and up to 20 minutes without interruption; sit a total of two hours in an eight-hour workday and up to 30 minutes without interruption; occasionally climb,

stoop, kneel, balance, crouch and crawl; his abilities to reach, to handle, to feel and to push/pull were limited; and he was restricted from working around moving machinery, temperature extremes, noise and vibration. (R. at 623-25.) Dr. Wheatley based his findings on Hubbard's compression fractures, degenerative disc disease and complaints of sensation loss in the right hand. (R. at 623-24.) He opined Hubbard would be absent from work more than two days a month. (R. at 625.) However, the ALJ noted that Hubbard was not as limited as Dr. Wheatley opined. (R. at 24.) The ALJ noted that the record supported a light residual functional capacity finding. (R. at 24.) The ALJ noted that, while Hubbard complained of pain at his hearing, the medical record consists of only conservative care with few complaints or abnormalities. (R. at 24.) The ALJ noted the record showed Hubbard typically had normal gait, station and range of motion. (R. at 24.) Furthermore, Hubbard routinely reported that he had good pain relief with his current pain medication, stating he was able to perform his activities of daily living. Hubbard also reported that he was walking and swimming for exercise. *See Gross*, 785 F.2d 1163, 1166.

Based on this, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and his residual functional capacity finding. An appropriate Order and Judgment will be entered.

DATED:   January 4, 2024.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE